UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY - TRENTON


```
---------------------------
MEDEVA PHARMA SUISSE A.G.,   :   Docket No.: 07-CV-5165-TJB
et al.,                      :
                             :   Trenton, NJ
             Plaintiffs,     :
                             :   November 23, 2010
     vs.                     :
                             :
ROXANE LABORATORIES, INC.    :
                             :
             Defendant.      :
---------------------------
```

TRANSCRIPT OF CONFERENCE HEARD BEFORE
THE HONORABLE TONIANNE J. BONGIOVANNI, U.S.M.J.

TRANSCRIPT ORDERED BY:

    FRITZ SAMMY, PARALEGAL
    (GIBBONS, PC)


A P P E A R A N C E S:

    CARRIE LONGSTAFF, ESQ., (Gibbons, PC)
    Attorney for Plaintiffs

    CHRIS SIPES, ESQ. (Covington and Burling)
    Attorney for Plaintiffs

    PAUL AINSWORTH, ESQ., (Covington and Burling)
    Attorney for Plaintiffs

    MEGAN KEANE, ESQ., (Covington and Burling)
    Attorney for Plaintiffs

AudioEdge Transcription, LLC
425 Eagle Rock Avenue - Suite 201
Roseland, New Jersey  07068
(973) 618-2310
www.audioedgetranscription.com

A T T E N D A N C E (Continued)

    MARK S. OLINSKY, ESQ., (Sills Cummis Gross, P.C.)
    Attorney for Defendants

    JAMES GALBAITH, ESQ. (Sills Cummis Gross, P.C.)
    Attorney for Defendants

<u>I N D E X</u>

11/23/10

<u>ARGUMENT</u>:                                              <u>PAGE</u>

    By:  Mr. Galbaith                          6, 13, 22, 29,
                                              33, 40, 52, 57

    By:  Mr. Sipes                             9, 16, 26, 30,
                                                 38, 46, 54

The Court                                          4

1          THE COURT:  We're here in Medeva vs. Roxane.  Can I

2    have appearances?

3          MS. LONGSTAFF:  Carrie Longstaff on behalf the

4    plaintiffs.  And I'd like to introduce the Covington folks.

5          MR. SIPES:  Your Honor, Mr. Sipes from Covington and

6    Burling on behalf of the plaintiffs, Medeva and Medeva and

7    Warner Chilcott.  And here with me is my colleagues, Paul

8    Ainsworth and Megan Keane.

9          THE COURT:  Didn't want to let -- Ms. Megan what?

10         MS. KEANE:  Keane.

11         THE COURT:  You didn't want to let Ms. Keane sit at

12   the table with you, or she didn't want to sit at the table

13   with you.

14         MR. SIPES:  I didn't want to ask her.

15         THE COURT:  She certainly, if you want to scoot

16   around, you're more than welcome.  If you're content back

17   there, that's fine.  Great.  Thank you.  You can be seated.

18         MR. OLINKSY:  Good afternoon, Your Honor.  Mark

19   Olinsky, O-L-I-N-S-K-Y from Sills Cummis and Gross, and

20   joining me is Mr. Galbaith, who you're familiar with, on

21   behalf of Roxane.

22         THE COURT:  Yes.  This is a familiar panel to me.

23   Good afternoon.

24         I have some very discreet pointed questions.  I,

25   obviously, have the benefit of the briefing in this case.  And

1   I didn't bring you in here just for the exercise of it. So, if

2   you bear with me, we should be able to get through this fairly

3   swiftly.  I don't think it will be as swift as perhaps the

4   Supreme Court of Third Circuit argument.  I don't have the

5   red, yellow lights up here, and I'm not limiting anyone to 15

6   minutes, certainly.  But hopefully, we won't be here anywhere

7   near the wee hours of the evening.

8

9                              **(REDACTED)**

10                                                              And

11  if I could turn to Roxane, and I have a couple of questions.

12  So, let me just string them along for you.

13          First is -- uh, oh.

14          MR. OLINSKY:  I'm okay.  I have to answer your

15  question.

16          THE COURT:  First is why shouldn't Roxane and -- why

17  shouldn't this lot number have been considered part of

18  Roxane's Endo product?  And tying that into how come it was

19  never identified on your privilege log?

20          And I do recognize that you have provided a

21  explanation in your papers relating to tying it into expert

22  discovery and that it didn't need to be produced.  But I just

23  want to clarify if that's the only answer you're sitting with.

24          And if so, what happens if I disagree with you on

25  that point and find that it actually falls outside of the

1    tying it solely into the expert production and that you had a

2    separate obligation to, at least, identify the existence of

3    the product, perhaps not the testing, etcetera, but, at least,

4    the existence?

5              So, let's start there.

6              MR. GALBAITH:   I think the advance have overtaken

7    this motion, Your Honor.   This -- to bring everybody up to

8    speed on what's happened here.

9

10

11

12

13

14

15                          **(REDACTED)**

16

17

18

19

20

21

22              Nobody is referring to this as -- anymore.   Our

23    expert is not relying on it.   Their expert is not relying on

24    it.

25                          **(REDACTED)**

1              .  But it's -- it's no longer really part

2      of the case.  So, what happens to it, I don't think it's --

3      frankly, I don't think needs to be decided, at this point.

4

5

6

7

8                              **(REDACTED)**

9

10

11

12

13

14              THE COURT:  And what were you thinking or

15      contemplating might happen as a result of that experiment?

16      What were you either hoping for or trying to negate?

17              MR. GALBAITH:  The -- well, trying to find out the

18      answer.  The way the -- the experiment was supposed to work,

19      the product would be ingested by a -- a subject of

20      experimental -- a volunteer, a paid volunteer.  And it would

21      go into that volunteer's stomach and go into his medicine

22      track.

23

24                              **(REDACTED)**

25

1          And what we hoped it would show was exactly the fate

2     of the tablet when -- when the tablet disintegrated and

3     released its contents.

4

5

6                              **(REDACTED)**

7

8               And that's an issue in this case.  Where does

9     this tablet disintegrate in the digestive tract?  That is the

10    issue on infringement.

11          THE COURT:  Unfortunately, I know that, ad nauseam.

12          MR. GALBAITH:  You've heard that before.  But -- and

13    the experiment was designed to test the hypo-- or to determine

14    where that occurred.

15

16

17                            **(REDACTED)**

18

19

20

21     That's why we came back to Your Honor to ask for more time to

22    do more experiments and that's why we offered to stay off the

23    market for an extended time the first time because our

24    experiment failed.  That's what happened to it.

25               There's no question, however, but for that reason, I

 1    think it's a -- a really moot point.

 2              THE COURT:  Let me have you hold that thought.  Is

 3    it a moot point?  And all I need is almost a yes, or no.

 4              MR. SIPES:  We don't believe it's completely moot,

 5    Your Honor.  Some of the harm to us has been eliminated by

 6    their recognition now that it's not representative of their

 7    product, which is not where we started this.

 8              There is, however, some lingering harm that -- that

 9    we do think maintains it's relevance to this motion.  A lot of

10    what's going on here, Your Honor, is a considerable amount of

11    after the fact revision.

12

13

14                            **(REDACTED)**

15

16              When they -- and we repeatedly inquired during this

17    time how many -- tell us all of the batches that -- released

18    as to how many you've made.  They never revealed this batches.

19

20                            **(REDACTED)**

21

22              THE COURT:  Let me, Mr. Galbaith, maybe you can sit

23    for one second --

24              MR. GALBAITH:  Sure.

25              THE COURT:  -- because I thought this would be a

1      tight question that I have.  But tell me you just said that it

2      doesn't eliminate the harm completely.  Tell me why not.

3           MR. SIPES:  Well, because the consequence of it

4      being sprung on us is that we had to work at considerable

5      expense, cost and expense, over the Christmas and New Years

6      holiday a year ago to actually determine what we found out

7      but, at that point, they were representing the exact reverse,

8      which was this was not at all representative --

9           THE COURT:  So, is this solely and I'm not

10     minimizing cost and distraction, but is this solely a cost

11     issue for you versus substantive?  Is there a substantive

12     issue for you?

13          MR. SIPES:  The -- the only substantive issue --

14     assuming that we are now in agreement, that this is not

15     representative.  That they are no longer representing that

16     this is representative of the Endo product, then -- then --

17          THE COURT:  Let's take a break.  Are we agreeing to

18     that, Mr. Galbaith?

19          MR. GALBAITH:  Yes, Your Honor.  We said that almost

20     a year ago.

21          THE COURT:  Okay.

22          MR. SIPES:  So, assuming then -- the only issues are

23     the costs involved and the fact that we think it shows in

24     connection with the other documents that were lost the fact

25     that there has been a distortion of discovery that prejudiced

1        us.  This would have been tried last March as -- that product

2        being represented -- representative of their Endo product,

3        were we not able with our experts over the Christmas and New

4        Years holiday to discover what they had not allowed us to

5        investigate previously, which is the fact that it was not

6        representative of their product.

7                THE COURT:  And so, what's the remedy?

8                MR. SIPES:  Well, the -- we think the remedy is in

9        the context.  We think this shows in the context with the

10       other documents that were destroyed that there has been a

11       serious aversion of factual discovery in this case.

12               And we think this shows both the fact that it's been

13       ongoing and that we've been prejudiced.  This shows the type

14       of harm that may result.

15               The other -- in terms of the secret batch itself,

16       that's the only relevance, Your Honor, other than the cost

17       because we were able to -- to discover on our own that it was

18       not representative and they have now acknowledged that.

19               THE COURT:  Okay.  I don't want to then belabor this

20       point too much but I do think it is important for me to have,

21       I think, the -- to have the rest of these questions, at least,

22       perhaps slightly addressed, not in as much detail, give you

23       the chance for whatever spill over effect, it might have, Mr.

24       Galbaith, on any of the other questions that I have.

25               So, let me ask you, just to talk to me a little bit

1    about, again, let's assume that I've -- I find that the --

2    that this -- the fact that this batch existed should have been

3    disclosed and contained in -- in some -- at least, in some

4    privilege log and that it's not protected by tying it to an

5    expert.  Are there any cases that you can point to that stand

6    for that proposition?

7              And again, I'm not talking about any of the testing

8    of the product, but just the fact that the product exists.

9              MR. GALBAITH:  Well, I mean, we cited cases that

10   show that this is classic work product.  They've cited no

11   cases to show that it isn't.  We cited -- we cited a Third

12   Circuit case that says that work product like this does not --

13   work product is not -- is generated after the case starts is

14   not something you have to schedule.

15             THE COURT:  And that's the case that they say that

16   in a footnote, as I recall.

17             MR. GALBAITH:  It's the <u>Grider</u> (phonetic) case --

18             THE COURT:  It's the <u>Grider</u> case.  Okay.  But then

19   tell me how is this case different from the <u>Feacher</u> case,

20   phonetic F-E-A-C-H-E-R, out of New York.  I recognize it's a

21   District Court case, but --

22             MR. GALBAITH:  Well, I guess I -- typically, Your

23   Honor, I've just never been in a case where you have to

24   schedule your work product as a -- certainly, the plaintiff

25   never scheduled any of their ongoing work product in this case

1    while it was being generated.

2          We have -- they did a lot of experimental work of

3    their own.  None of that was ever put on a privileged log.

4    And the same with us.  The experimental work that was done on

5    behalf of our client that we did was not put on a privileged

6    log.

7          I've never been in a case, frankly, where anyone did

8    that.  And I think that's what the Third Circuit case tell us.

9

10

11

12                          **(REDACTED)**

13

14

15

16          MR. GALBAITH:        **(REDACTED)**          . This

17   -- this was -- there was -- there was a motion practice in

18   this case where the plaintiff asked Your Honor to order us to

19   disclose it to the FDA.  And Your Honor said, we didn't have

20   to.  That's -- that's the context.

21

22

23                          **(REDACTED)**

24

25

1        But in any event, neither side here has given

2   ongoing updates of its work product.  Every time I write a

3   letter to the client, I don't schedule in a log and send it

4   off to -- to the other side and they have not been doing the

5   same thing with us.

6        The correspondence that they've had with their

7   experts, they have not sent to us.  We have not done the same

8   thing.

9        THE COURT:  Well, in part, you have a separate

10  agreement dealing with the experts.  And I think that

11  communications with your client are very different than the

12  existence of a -- a product.

13       MR. GALBAITH:  But work product is work product

14  whether it is done by an expert or a client.  That's what the

15  Rule says.  It says by or for a party.

16       THE COURT:  No.  I'm not saying it's not work

17  product.  The question is why it's not -- the log is just not

18  updated and identified.  And -- and it's -- this is to me is a

19  very different type of -- it's not a document, it's a item

20  than a -- a letter or a correspondence that's just sent to a

21  client in the normal course keeping them updated.

22       MR. GALBAITH:  The -- first of all, the -- the --

23  under the Third Circuit law, as we read it, we don't have to

24  do that.

25       Secondly, putting a -- a logging material like this

1    on the -- on a privileged log reveals the work product.  It

2    does reveal the kind of experiments we are doing.  It reveals

3    our mental process -- it essentially tells them what our work

4    product is before the time required under the schedule to

5    reveal that work product.

6         We don't think we're obligated to do that.  We know

7    of no case law or order that requires us to do that.

8    Certainly, they didn't do that on our behalf.

9         MR. SIPES:  Your Honor, if I may, just very quickly.

10   The context here is very important.  First of all, we're not

11   aware of any cases that have suggested that work product can

12   be used to hide the actual existence of materials.

13        In fact, my understanding of the law is the exact

14   reverse.  That one cannot hide the existence of materials

15   through work product even to simply try to shield from just

16   what your materials are.

17        In this case, in particular, remember there was a

18   dispute from the very beginning in this case about the

19   availability of delayed release -- product made by defendants.

20        When the case began, they had only one lot and it

21   was expired.  And they insisted that before they produce it to

22   us, that we would agree not to do human testing without Court

23   agreement because of that.  There has been a dispute from the

24   beginning about the availability of this material.

25        We asked them several times throughout the course,

 1    which lot -- what lots were manufactured at least for --

 2           Work product doesn't justify giving a false answer

 3    to those questions.  If -- what --

 4           THE COURT:  Or even just an omission.  I think, as I

 5    understand Mr. Galbaith, his position is that this -- the

 6    existence of the product itself is considered work product and

 7    that because it's -- it is work product, that he didn't have

 8    to put it on a log because that would have defeated the

 9    purpose and you would know.

10           MR. SIPES:  But, of course --

11           THE COURT:  And you disagree.

12           MR. SIPES:  Even in the interrogatories -- they

13    could have said, there may be additional batches made at

14    Counsel's request whose production would be protected by work

15    product.  And then, we could have this discussion about

16    whether or not, in fact, they are produced.

17           They unilaterally resolved it by not even saying

18    that.  If Mr. Galbaith had said in the interrogatory

19    responses, and the 30B6 deposition on this point, the witness

20    had said, and that the chart they had brought had said, there

21    may be additional batches protected by work product that was

22    made at Counsel's request.

23           Then we could have aired the issue and decided then

24    whether we're entitled to factual discovery.  But to -- to

25    hide even the issue, which -- this is a very unusual assertion

1    of work product privilege.

2              And -- and it certainly wasn't the way that the

3    product was treated when they tested it.

4

5                              **(REDACTED)**

6

7

8              But we don't need to get into the merits, because

9    the merits were foreclosed.

10             THE COURT:  And -- and actually, thank you.  I know

11   we got off track a second.

12

13

14                             **(REDACTED)**

15

16             So, for whatever that's worth, that's what -- that's

17   where I was going with that question.

18             But let me ask you your position about this before

19   and after the complaint distinction.

20             MR. SIPES:  Well, both parties have really been

21   producing materials that post date the complaint.  In fact,

22   one of the two lots of material that was produced was post

23   complaint.  There hasn't been a shield for material produced

24   after.  In fact, you know, they now have an ongoing promise to

25   prod-- to continue produce their -- and their correspondence

1    with FDA.

2            But this is particularly important with regard to

3    the test product.  Because remember there was a limited amount

4    of product available for testing.  And there was a great

5    concern about what material was actually represented in the

6    Endo because the material that was available at the start of

7    the case had expired.

8            And that was the reason why there was so much

9    inquiry into when they made new batches.  They knew that this

10   was at issue.  This question of what material is available to

11   test.

12           If they want to assert work product on the actual

13   material itself, people have a right to serve work product

14   even if they may not have, in the end, to be found work

15   product.  But they have to tee up the issue in a way when both

16   sides have a fair opportunity to contest it, where they know

17   this is a disputed issue.

18           By doing what they did, they put it in a position

19   where we didn't even know the issue existed of a lot of

20   material that was purportedly work product.  We had no

21   opportunity.  We asked specifically by interrogatory, by

22   letter and by deposition for what lots had been made.

23           At a minimum, they have to put us on notice that

24   they're not giving us a complete response and there may be

25   other lots that they're asserting work product for.

Argument - Galbaith                    19

1          And, of course, the consequence, it's clear why.

2    Because when it gets sprung on us after factual discovery,

3    there's a good chance that we won't be able to test it.

4          We were very fortunate.  We have good experts in

5    this case, who are real experts.

6

7

8

9

10                        **(REDACTED)**

11

12

13

14

15          THE COURT:  Can I assume the questions, any

16   questions I might have about the human testing issue are

17   really not of any moment here?

18          MR. SIPES:  I don't think they're relevant to this

19   motion, Your Honor.

20          THE COURT:  All right.  I'm switching gears.  Let's

21   turn to, I guess sort of from the beginning.  The whole

22   question of the retention policies.  And I -- I want to make

23   sure the time line.  So, Mr. Galbaith, when do you claim that

24   your client actually anticipated litigation in this matter?

25          MR. GALBAITH:  I think we don't.  We're not going to

1   argue that was before 2000-- that it was after 2002, Your

2   Honor.  I think that's when they started looking at this.  And

3   they had a policy in place that all documents in a -- related

4   to a live file, that this was, are to be retained.  That --

5   that was the company policy.  And --

6

7                           **(REDACTED)**

8

9            MR. GALBAITH:  I think the date that the plaintiff's

10  have argued for is February, 2002.  And I'm making an

11  objection to that.

12           MR. SPIES:  I think the date we said originally is

13  July 31, 2001.  You have it exactly right, Your Honor.

14

15

16

17                          **(REDACTED)**

18

19

20

21           THE COURT:  What about that?

22           MR. GALBAITH:  I don't know.  That's -- that --

23           THE COURT:  You should know.  That's important.

24           MR. GALBAITH:  Frankly, I don't think it's important

25  because there was a policy that predates all of these policies

1      that goes way back.  And to any time there was work done on a

2      -- on a -- on a live product for Roxane, Roxane had a policy

3      in place to retain documents --

4              THE COURT:  But we don't have a litigation hold

5      until '05.

6              MR. GALBAITH:  That's correct, Your Honor.  But we

7      had a policy that -- that documents were not to be destroyed.

8              MR. SIPES:  And, Your Honor, just to clarify, the

9      litigation hold was 2007 after the Endo was filed.

10             THE COURT:  Okay.  But in any event, whether it's

11     July 31st, or -- at -- at best, it's July 31st, at worse or

12     vise versa, the earliest is July 31st.  That's how I should

13     characterize it.  The latest -- would be February, 2002.

14             MR. GALBAITH:  February, 2002.

15             THE COURT:  '02.  All right.  Okay.  Then let me

16     ask, let me turn to Medeva, actually.  So, Mr. Galbaith, you

17     can get off your feet for a minute.

18             If we have the litigation hold, and it's put into

19     place in July '07?

20             MR. GALBAITH:  I think so.  That's approximately

21     right, Your Honor.

22             THE COURT:  Okay.  Then why is the retention policy,

23     which I believe is attached to Roxane's response at HH

24     insufficient?

25             MR. SIPES:  There's -- there's a three fold answer

Argument - Galbaith                                    22

 1    to that.  First, let -- let me be clear on this retention

 2    policy that they've come in.  That was produced on the day

 3    that they filed there sir reply.  So, we had no opportunity to

 4    question any witnesses on that.

 5              Our reading on it is that it's actually quite

 6    limited.

 7                            **(REDACTED)**

 8    But without getting into a fight over what their memo means to

 9    them, we do know that many important development documents

10    were not preserved.

11                            **(REDACTED)**

12

13              Remember, as -- as you probably too

14    well, this is a product that actually acts topically in the

15    gastrointestinal tract.  So, how it releases its release

16    profile is critical to development of a generic product.

17

18

19

20                            **(REDACTED)**

21

22

23

24              THE COURT:  Okay.  But, quite actually, that ties

25    into another area of questions I have.  Putting aside whatever

1    Roxane's obligations were on spoliation, did you go to

2    Anapharm and attempt to obtain documents and -- and why

3    wouldn't that be your responsibility, as well?

4              MR. SIPES:  We didn't know of Anapharm's role until

5    fact discovery was closed.  They say -- the name Anapharm only

6    appears twice in 90,000 pages of documents.  So, it wasn't

7    clear.  We didn't understand what they had done until we were

8    able to depose a number of their witnesses who were offered at

9    the end of fact discovery.

10             So, we came to an understanding of Anapharm after

11   fact discovery had closed.

12             THE COURT:  But why not come to me and ask for

13   relief because you folks certainly know how to do that if you

14   -- if you were concerned about fact discovery ending, ask for

15   the ability to issue a non-party subpoena if you think

16   Anapharm may now be in the possession of documents that are

17   relevant.

18             Because with spoliation, we always have a number of

19   concerns.  But at the end of the day, the idea is are you able

20   to get in your hands information that you need to either

21   prosecute or defend a case.

22             And while it may very well be that Roxane would

23   still be held responsible for not having produced the

24   documents and could be sanctioned for it's conduct, if you --

25   you can't just sit back and say, well, we didn't -- we didn't

 1    look anywhere else because we didn't want to bother.

 2              MR. SIPES:  At that -- at that point -- there's --

 3    there's two aspects to it.  One, is that at that point, we

 4    didn't believe we had time even if we could get leave.

 5              Number -- by this time, it's the late fall of 2009

 6    with the case scheduled ordered for trial in 2010.  We had

 7    sought other third party discovery in the case that had taken

 8    us more than a year to get documents.  The -- the way it has

 9    worked is when we have served third party subpoenas in this

10    case, Roxane's counsel, has also ended up representing those

11    third parties.  And it took us a year to get third party

12    documents.

13              THE COURT:  Where's Anapharm located?  Do we know?

14    Do you know?

15              MR. SIPES:  Standing here today, I apologize, Your

16    Honor.  I don't know where Anapharm --

17              MR. GALBAITH:  I believe it's an American company.

18    One of the problems that we had with the other subpoenas is

19    they were located in Europe.

20              MR. SIPES:  So -- so we were concerned about time

21    and candidly, preparing for trial in the case and going

22    through expert discovery.

23              The other thing is our focus really is on what -- we

24    think what's relevant here are the documents, which are

25    missing, which is what did Roxane do with this information?

1          That is they reached a conclusion.

2                          **(REDACTED)**

3                  We think they set that up as their target

4     for -- for that -- their product, which is directly relevant

5     to the issues in the case.

6          But it's -- it's Roxane's documents that are

7     directly relevant to the case, which is --

8          THE COURT:  Well, I know one of the things that

9     you're complaining about is the fact that you don't have the

10    protocol.  I think Roxane said in one of the questions I have

11    for Mr. Galbaith, just so I'm clear on the answer, is I don't

12    know whether they never had it or they had it and no longer

13    have it.

14         And I guess for both of you folks, this is your

15    business.  Are protocols generally produced from, I call them,

16    non-parties?

17         MR. SIPES:  Your Honor --

18         THE COURT:  Provided to you, I mean.

19         MR. SIPES:  In my experience, the way the protocols

20    worked is they're defined by the sponsor.  So, in this case

21    that would be Roxane, worked out with -- it's called a CRO, a

22    contract research organization.  So, the protocols worked out

23    between them and they would preserve parties.

24         Typically, in the litigation, these protocols come

25    out.  We have protocols for other studies that were done,

1   later studies that were done.  We even have protocols for the

2   studies that were done by the experts.

3          THE COURT:  The question that I have though is --

4   when I mean -- when I said, produce, I meant, you have now

5   contracted.  And in this case, they -- Roxane and Anapharm has

6   this business arrangement.  And is it in your experience the

7   norm that Roxane as the contracting party would retain in it's

8   files a copy of the protocol.

9          MR. SIPES:  That's -- that --

10         THE COURT:  Because frankly in other situations the

11  parties who were doing all of the testing and all of the run

12  down, don't -- do not necessarily provide the contracting

13  party with all of that minutia of detail.  I recognize the

14  protocols different.  But in your experience, in that, not in

15  terms of litigation, but in terms of that business

16  arrangement.

17         MR. SIPES:  Yes, Your Honor.  In my experience, the

18  contracting party in working with the CR always retains the

19  protocol.

20         THE COURT:  Let me ask Mr. Galbaith that question.

21         MR. GALBAITH:  That's not necessarily true.  The --

22  this -- the way this was done was there is a contracting

23  party, a fellow named, Kramer, who actually dealt first hand

24  with Anapharm.

25

1

2

3                          **(REDACTED)**

4

5                    Nobody suppressed this evidence.  They got

6     it because Roxane produced it to them.  There's no hiding of

7     this study.  Roxane -- the only reason they know about it is

8     because it was in Roxane's files and Roxane provided it.

9              It's not clear from this record whether there ever

10    was a protocol in Roxane's possession.  But the point is that

11    the study report --

12              THE COURT:  Well, has -- I'm sorry, has anybody

13    been asked that question at all in the -- in the depositions

14    that you've taken?

15              MR. SIPES:  Yes, Your Honor.

16

17                          **(REDACTED)**

18

19              THE COURT:  But the question also is whether it was

20    ever in Roxane's possession.

21              MR. SIPES:  The question was in there --

22

23                          **(REDACTED)**

24

25

1              So, she testified that they would have had the

2        protocol.  I can give you the cite.  It's exhibit six.  It's

3        the deposition of Ms. Erentz, at pages 56 to 57, beginning at

4        line 56, line 23, and going to page 57, line 5.

5              THE COURT:  Again --

6              MR. SIPES:  She was a 30B6 witness.

7              THE COURT:  I guess I come back to the -- the

8        question is if Medeva, based on its general experience and

9        then based on the testimony felt that there was a protocol.

10       And if it was so crucial, why you didn't bother to make

11       efforts to obtain that from Anapharm instead of just throwing

12       up your hands and saying, well, Roxane has spoliated, if

13       that's a word, and then, therefore, should be sanctioned.

14             MR. SIPES:  Your Honor, I believe that what happened

15       is that by the time we learned of this and appreciated it's

16       significance, it was the fall of 2009.  We were into expert

17       discovery and rushing for trial.  Pretty shortly thereafter we

18       had sprung on us --

19             THE COURT:  I know.  But -- but, obviously, here it

20       is the fall of 2010, and a lot has happened, including back in

21       the spring the stipulation that they weren't going to launch.

22       And that there was going to be a continuation.  So, I guess

23       I'm just concerned that when it now was clear -- when it

24       became clear that we were going to have time that there wasn't

25       any effort to even see if you could get this information.

1          So, the -- the real obvious -- if it's not obvious,

2    I'll make it obvious.  The practical obvious question I have

3    is if you're jumping up and down about this information and

4    saying it is so important, why you didn't try to get it from

5    somebody else, namely Anapharm at any point since you became

6    aware of it?

7          And I won't torture you anymore.

8          MR. SIPES:  Thank you.

9          THE COURT:  I understand your answer.

10         MR. SIPES:  And I guess the other point, too, is by

11   the time we actually were aware that they were going to seek a

12   delay, we had already filed our motion seeking redress.

13         But -- but, Your Honor, I -- I take --

14         THE COURT:  Mr. -- go ahead, Mr. Galbaith.  Do you

15   have something you want to say?

16         MR. GALBAITH:  Your Honor -- the -- the report is --

17   first of all,

18                              **(REDACTED)**

19                              But that's -- other than that,

20   the reports says what they did.  The report says, we did this.

21   We did this.  We did this.  That's the protocol they followed.

22   It's in the report.

23         The protocol says, here's what we're going to do.

24   The report says, here's what we actually did and here's the

25   results that we got.

1            THE COURT:  Do they ever differ?  And you know we're

2      talking inferences.

3            MR. GALBAITH:  I don't know that they ever differ

4      but what is important here is what the results were.  And they

5      have those results.  Roxane produced them a long time ago.

6            And the only utility of those reports is to provide

7      some basis for a motion.

8

9

10                          **(REDACTED)**

11

12

13            And secondly, obviously, in early -- late 2009 and

14      2010, somebody at the plaintiff's office was spending an awful

15      lot of time preparing these motion papers, which are double

16      sided about two inches thick.

17            And, it seems to me, Your Honor's point is well

18      taken, that if this was something important, either come to

19      Your Honor to ask, or come to us to see if we can get it.

20            We never even heard about this issue until we saw

21      this motion.  Nobody mentioned to us that there was any

22      problem with this Anapharm study or this Anapharm protocol.

23            THE COURT:  Just getting back -- let's focus on the

24      specific issue, getting back to the more generic issue

25      regarding spoliation.  Tell me, Mr. Galbaith, I didn't pursue

1    this before, but you mentioned that you didn't think you need

2    a litigation hold earlier because the retention policy was

3    sufficient.  Why?

4           MR. GALBAITH:  Well, I think it's not the question

5    of whether it would have been a good idea or not a good idea

6    to have a -- to have a direction from

7    -- from counsel, don't throw anything away.

8           But, in fact, we're dealing with facts of a

9    particular case here, not what's the best practice as far as a

10   pharmaceutical company.

11          But we're doing in this case, there was a retention

12   policy in place that covered this -- all these development

13   documents.  So, the people at Roxane were under direction,

14   being a regulated company, to retain -- to retain the

15   documents and not to destroy them.

16          And that policy -- the -- a copy of that policy was

17   produced very early in the case.  It wasn't just come with the

18   -- the -- it didn't just come with the certified brief.  It

19   was produced early on -- in the first dep-- depose on.

20          But -- but, I mean there is no -- I don't think

21   there's any inference that can be drawn from the fact that a

22   formal litigation hold, a direction from counsel wasn't sent

23   out until the case was filed.

24          THE COURT:  No.  I think in some of the papers you

25   cite to a 2008 policy.  But wasn't --

 1              MR. GALBAITH:  The policies go back --

 2              THE COURT:  We've been

 3              MR. GALBAITH:  -- we did go back and pull out the

 4      earlier ones and they're similar.

 5              THE COURT:  All right.  Somewhat along the same vein

 6      of dealing with documents, and I had just a really basic

 7      question when I was reading all of the information about the

 8      emails and the digital discovery, the computer discovery, is

 9      as you folks are aware, under our rules of civil procedure and

10      then specifically here in our local rules, referencing 26f and

11      then local rule 26.1 -- 1d3, you're required to meet and

12      confer.

13              This is a big area for all pharma cases.  And you're

14      required to -- to talk about what -- what you're going to be

15      doing in terms of your computer discovery, your electronic

16      discovery and whether or not you are, for example going to

17      have your back up tapes preserved.  And I understand that's

18      one area that you had an agreement.

19              So, I am just a little perplexed as to why you

20      didn't have something in place that from -- from the outset.

21      And this case was filed in '07, and perhaps some of this

22      information would have been caught up in that.

23              So, talk to me about, you know, what discussions you

24      folks had, if any, regarding how you're going to preserve

25      documents, computer -- digital documents.

Argument - Galbaith                             33

1          MR. GALBAITH:  There were discussion about -- about

2     the -- the discovery, I guess it's called and there was an

3     agreement reached, which is one of our exhibits.  I have to

4     dig it out.  Bear with me.

5          THE COURT:  Well, I know the back up tapes and the

6     stipulation is referenced on page 15 of your briefs.  But I

7     don't recall where the -- if the -- where the actual e-

8     discovery agreement is.

9          MR. GALBAITH:  I apologize.  I just don't remember

10    where it is in -- in the pile of exhibits.

11         THE COURT:  Welcome to my life.

12         MR. GALBAITH:  I just have to find it, Your Honor.

13         THE COURT:  Okay.  But --

14         MR. GALBAITH:  But there is a -- there was an

15    agreement reached about how to handle e-discovery.

16         And, again, and here we are, have them having filing

17    a motion after discovery is closed about suddenly complaining

18    about the email production with nothing --

19         THE COURT:  And I know one of the big things is this

20    -- which I'm still learning, native format, different format,

21    and you jinxed me because I repeatedly go through these

22    conferences.  And, knock on wood, I say, this is really not a

23    huge issue for me.  I might have people coming talking about

24    search terms and their too broad and narrow them, and that

25    sort of issue.

1           But, in terms of the actual preservation, and this

2      bar in particular, has been wonderful about designating people

3      and making sure that you know exactly what you want and

4      whether the native format matters or whether you need the hard

5      copy.  And perhaps it's because you speak the same Geek

6      language behind the scenes, so you understand it a lot better

7      than I do.

8           So, I was a little disheartened to see that now I

9      have my e-discovery dispute.  And then, again, perplexed as to

10     whey it wasn't really spelled out that -- regarding what the

11     production would be.

12          But, you know what, Mr. Galbaith, you can actually

13     get off the hot seat for a minute.  Because one of the

14     questions that I do have for Medeva is what harm, at the end

15     of the day, again, what harm have you suffered by the fact

16     that you only received some documents in one format?

17          MR. SIPES:  Your Honor, we believe we're missing a

18     wide swath of product development documents.  The reason that

19     this wasn't addressed in the initial stipulation is we did not

20     imagine going in that there would be a six year development of

21     this product during which there was no litigation hold.

22          And there are -- it is clear that there are

23     documents missing.

24                              **(REDACTED)**

25          We know that there are documents missing.  One

1    of the Anapharm documents.   Clearly, there are documents

2    missing.   The other is a lot of electronic files.

3           The project leader for this project, for development

4    delayed -- delayed release -- at Roxane, is a fellow named

5    Eric Spiller (phonetic).

6                            **(REDACTED)**

7           THE COURT:   Let me ask a time question.   And I don't

8    know if you have this in front of you.   And, again, I

9    recognize that in a vacuum it might seem naively obvious to me

10   that this is an important issue.   And if you -- I -- I would

11   think that the outsets that you're asking your adversary about

12   their litigation hold and their retention policy early on.

13   And if that's done and you learn that there's a six year gap,

14   why aren't you doing something to address that immediately

15   with them and say, I have -- this is a red flag for me and I

16   have some concerns.

17          So, I don't know if you can speak now to when you

18   learned any of those --

19          MR. SIPES:   What I'm worried, Your Honor, is that

20   the witnesses that began the release -- and when we got the

21   log to show when they began to anticipate litigation, when we

22   began to learn of all these missing documents, it was late in

23   fact discovery.

24          Many of the witnesses that they produced that bore

25   on this issue were produced at the end of fact discovery.

1          THE COURT:  You didn't get a dated litigation hold

2     memo early on in document production?

3          MR. SIPES:  I don't think to this day we have a

4     litigation hold that I'm aware of.

5          THE COURT:  That was just all testimonial?

6          MR. SIPES:  Correct.  And so, you know, we -- we

7     simply felt -- we -- we were really blind sided with this at

8     the end of the fact discovery.  And then it became clearer and

9     then as we went back and looked at it, how much material was

10    missing.  I mean this -- this product almost sprang out

11    without any -- it's as if they created this product without

12    really having a target.

13         And then we began to understand that's what's going

14    on.  And there are a lot of missing documents.  Ordinarily, I

15    would say, you wouldn't think you would need the back up

16    tapes, that things would be preserved in anticipation of

17    litigation.

18         This is an unusual case --

19         THE COURT:  Okay.  And so then let me ask Mr.

20    Galbaith just why didn't we have a production of both the hard

21    copy document and emails, as well as the electronic version or

22    -- or just the electronic, which seems to me easier to

23    produce?

24         MR. GALBAITH:  The -- the -- Mr. Sipes incorrect

25    about when the document protection was described to them.

1    Actually, the very first deposition was taken in the case was

2    more than a year before fact discovery closed.

3            And that witness, Tina Carborino (phonetic),

4    described all the searches that had been done of every

5    witness, including Mr. Spiller.

6            Specifically, what had been done with respect to his

7    files and what had been fast.  So, it's not correct that they

8    didn't know what the document production was like and what the

9    documents -- how documents were searched before that.

10           This is the way Roxane chose to do the search.  It

11   was described in this deposition by Tina Carborino exactly

12   what she did, the steps she took.

13           As far as we were concerned, as far as anybody ever

14   told us, plaintiff's were okay with what was done.  There was

15   no complaint to us except the usual complaints about, you

16   know, what about this project?  What about that which we

17   resolved either with Your Honor's help or -- or on our own.

18           But in terms of the way documents were obtained from

19   Roxane and the way Roxane searched it's files and the way it

20   produced the documents, we never heard a complaint about it

21   until this motion was filed.  And suddenly, it's -- it's a

22   huge deal.

23           And with respect to what they've actually discovered

24   in terms of missing emails, they found two.

25           THE COURT:  Let me ask you on page 9 of their

1    opening brief, they outline a number of, as they characterize

2    them, critical documents that they received only paper copies

3    of and they go through them.

4        Do you -- are those documents still retained in the

5    emails or have they been purged or written over?

6        MR. GALBAITH:  The -- this -- are you referring to,

7    Your Honor.

8        THE COURT:  No.  Well, I guess both, yeah.  Above in

9    the paragraph they give an example.  But yes, so both -- both

10   of those.

11       MR. GALBAITH:  I don't know whether these -- these

12   documents exist in electronic form.  This was the form that

13   was apparently easiest for Roxane to retrieve them from.  This

14   was the form we produced them in.  This was the form that --

15       THE COURT:  And your position is --

16       MR. GALBAITH:  This was the form that was acceptable

17   to plaintiff's throughout this case until after discovery

18   closed and this motion was filed.

19       THE COURT:  And your position is that all but two

20   items have been produced and only two are missing, although I

21   don't know how we determined --

22       MR. GALBAITH:  The ones they -- they identified two

23   because they prepared document production from an outfit

24   called Quintiles (phonetic), which is a contract researcher

25   that did clinical trials and documents produced from Roxane.

1

2

3                              **(REDACTED)**

4

5

6            THE COURT:  Okay.  But I guess, how do they prove

7       the negative?  Because if they're missing, then how do we --

8       how are we certain that there are no other crucial documents

9       that are missing because I think in your brief, you call them

10      a stray email or two that were missing.

11           MR. GALBAITH:  Your Honor, I can't -- nobody can

12      prove the negative.  We did a search, and this is what people

13      were told to maintain in their files.  And they maintained

14      their files.  We did the search.  We produced what we found.

15           They can't prove the negative.  We can't prove the

16      negative.  But to say that there are vast swaths of documents

17      missing is just wrong.

18           We produced 80,000 pages of paper including

19      thousands of emails and thousands of development documents,

20      report after reports, 30 - 40,000 pages from the A and DA with

21      -- with dozens of reports in it, development documents within

22      the A and DA.

23           It's not like they don't know what this product was

24      and how it was developed.  They've got a mountain of

25      information about this product --

1          THE COURT:  Oh, but I know you folks are never

2     satisfied with the mountain.  Or you want a mole

3     -- you have a mole hill and you want to create a mountain.

4     But let's --

5          MR. GALBAITH:  I think what they want to create is -

6     - is -- is a -- is something different, Your Honor.

7          THE COURT:  Let me ask though, mr. Galbaith, then --

8

9

10

11                        **(REDACTED)**

12

13

14

15

16          MR. GALBAITH:  Well, she -- I mean, she did her

17     best, Your Honor, to determine that the -- the company had a -

18     - even if the company had a litigation hold policy, somebody

19     still might have thrown stuff out.  The company had a policy

20     not to destroy these documents.

21          She searched -- she -- she testified about the

22     search that was done.  They went through the search that was

23     done.  They were happy with her testimony as far as we knew.

24     And we never heard about a complaint about any of these

25     documents until this motion was filed.

1            MR. SIPES:  Your Honor, may I respond for a second?

2     Mr. Galbaith, has now several times has suggested that we

3     brought this motion for the wrong purpose.  And I just want to

4     respond to that quickly.

5            This is the first time as I can recall I've ever had

6     to bring a spoliation motion.  And, candidly, have never seen

7     anything quite like this.

8            THE COURT:  Thank you.

9            MR. SIPES:  It's -- it's admitted that they were

10    anticipating litigation, consulting with lawyers and claiming

11    work product back in 2001 and never put a litigation hold.

12           Now, Mr. Galbaith has represented that somehow it

13    was understood don't destroy any mesthalime documents.  Well,

14    there's no document that suggests that  There's no hold that

15    says don't destroy mesthalime documents.  And we know there

16    are missing documents.

17           THE COURT:  Well, we know of two.  And I understand

18    that you might not be in a position to necessarily know if

19    there are more.

20           MR. SIPES:  We know of more than two.  We know two

21    from the Quintiles production or at least two documents that

22    should have been in their production that weren't.  So, we

23    know two there.  We know this whole Anapharm protocol, there's

24    no other -- there's must have been documents.  But

25                           **(REDACTED)**

1

2

3

4                        **(REDACTED)**

5

6

7

8

9            We can surmise there are a lot of documents.  You

10    know, Judge Cavanaugh, recently in the Sinophia -- (phonetic)

11    case in talking about Glenmark.  That's another generic.

12    They're sophisticated litigants.  He said once a party

13    reasonably anticipates litigation, it must suspend its routine

14    document retention destruction policy and put in place a

15    litigation hold to ensure the preservation of relevant

16    documents.  That what should have been done here.

17            I don't know now what was destroyed.  How can we

18    possibly know that?

19            THE COURT:  Okay.  But let's tie that into than

20    what's sanctioned.  Let's assume I find that Roxane destroyed

21    documents or failed to have an appropriate preservation order

22    that was -- or a litigation hold in place.  And that documents

23    were not produced that should have been.

24            As I sit here right now, all I have are the

25    quintellas documents to be able to upset -- to assess their

1    importance.  I don't have anything else.  So, part of the

2    analysis with spoliation, you have to consider the importance

3    of this information.  And so, what do I do with the fact that

4    there's conjecture.  Hey, they did it here with two out of how

5    many documents were produced?

6              MR. GALBAITH:  I think 80,000, Your Honor.

7              THE COURT:  So, two that we know -- two documents

8    are missing, 80,000 have been produced.  We're assuming, and

9    that really is all it is, we're assuming and perhaps from the

10   scale of assumption, it's closer to the better bet that there

11   was a protocol.  But we don't know.  And, by the way, even if

12   that's so, you do have the actual testing that outlines what

13   the

14   -- what steps were followed.

15             So, assuming I -- I agree with you, then what?

16             MR. SIPES:  I think, Your Honor, sort of an order

17   from least to most to try to -- I think, one thing is if they

18   have documents that may have been destroyed on back up tapes,

19   given that it's their failure to put in a litigation hold that

20   has created this situation, they should search their backup

21   tapes for responsive documents and produce those.

22             Because if they have them and they exist in those

23   backup tapes, they should be required to search for it and

24   produce them.

25             THE COURT:  But I don't think they have backup tapes

1    because didn't we -- you both agree that

2    -- you had a certain agreement with back up tapes and it's not

3    likely that they were preserved.

4              MR. GALBAITH:  I'm not -- I'm just not aware of

5    that.  We had an agreement that we didn't have to look at back

6    up tapes but that's a long way from saying that we --

7              THE COURT:  Okay.  Got it.  Okay.  Thank you.

8         MR. SIPES:  The next thing, I think, is you know what

9    Judge Cavanaugh was what he called -- what's called, I think,

10   a spoliation inference.  We know there are missing documents.

11   We cannot now know what was in them.  There should at least be

12   an inference that there were documents that were destroyed

13   because of the failure to put a litigation hold that were

14   relevant to the claims and defenses in the case.

15

16

17

18                          **(REDACTED)**

19

20

21         Now, we don't have a lot of documents from Roxane

22   about what they made of this.  How they used this as their

23   target.  But we think that there should be an inference in

24   this case, given that we're missing all of those documents,

25   that -- and Roxane now, they've made this an issue.  Roxane,

1    now in their pre-trial materials, proposes as a finding of

2    fact, that there is no evidence that Asicol releases to the

3    right side of the colon.

4              So, we think there should be an inference that A)

5    Asicol releases to the right side of the colon, and B) that

6    Roxane developed its product to match that release.

7

8

9

10

11

12

13

14                            **(REDACTED)**

15

16

17

18

19

20

21

22

23

24              THE COURT:  Okay.  Now, I don't think I got an

25    answer or I -- I am suffering from a lapse in memory myself.

1    Why does it matter which format the -- the documents that you

2    did get in a hard copy, why does it matter?  Why do you need

3    them in an electronic format?

4          MR. SIPES:  We believe, Your Honor, that what is

5    missing from the electronic format is not just the documents

6    in hard copy but maybe additional documents, as well.

7          THE COURT:  Okay.  That doesn't answer my question

8    though.

9          MR. SIPES:  But the fact that we didn't get them in

10   electronic copy shows that there was wide swaths of electronic

11   documents that were eliminated.  And it was --

12         THE COURT:  Okay.  So, you don't want those

13   documents that you have in the hard copy, you're not saying

14   that you want them in -- in electronic copy?

15         MR. SIPES:  Correct.  Correct, Judge.

16         THE COURT:  What you're saying is because they were

17   produced in paper format, you have a concern coupled with

18   these other issues.  And therefore, Roxane should go back and

19   do a search of their back up tapes.

20         MR. SIPES:  Correct.

21         THE COURT:  Got it.  Okay.

22         MR. GALBAITH:  Just to correct a couple of things,

23   Your Honor.

24

25                          **(REDACTED)**

1

2          With respect to -- to get any kind of sanction here,

3     I believe the law is clear that there has to be some real

4     showing of prejudice to the other side, that they didn't get

5     something or something -- or the evidence was destroyed.   They

6     can't prove something or they won't be able to prove

7     something.

8          We have on this issue that we're talking about here

9     where this -- this product releases it's contents, we've had

10    five experts, I believe, in this case comment on that.

11         They filed approximately eight expert reports on

12    this area.              **(REDACTED)**

13     None of them have looked at any of this evidence we're

14    talking about today.  All of them have relied on experimental

15    evidence that they have generated themselves or have been

16    generated by other -- or that have been generated by the other

17    side.  It is all a matter of the science and of the analysis

18    of the products themselves.

19         Emails here and there don't have anything to do with

20    that issue.  That's not how it's going to go down at trial.

21    It's going to be a bunch of experts and they're all going to

22    disagree or agree with each other.  And they're all going to

23    have different perspectives on this.  But it's not going to be

24    about what was in some protocol a decade ago.

25         So, they cannot prove any prejudice from the absence

1    of this protocol or of any of these documents or the fact that

2    two emails were missing from one production that were found in

3    response to a subpoena.

4         This is -- this is a case that's going to be proved

5    by the experimental results because the reason for that is

6    because when Roxane was developing this -- this product, there

7    is no question about this.  They don't dispute this.

8         Roxane never really examined that issue.  There is

9    no evidence, and they don't contend that there is any, that

10   Roxane actually ever determined precisely, scientifically, how

11   this product releases it's contents to the -- to the colon,

12   where it releases, when it releases, the exact timing of it

13   all.

14        They had guesses.  They had suppositions.  They had

15   inferences.  But they never did -- did that kind of

16   experimental work.

17        What they did was they -- they took the product,

18   formulated it.

19

20

21                        (REDACTED)

22

23

24        There's no -- there's just no evidence in the Roxane

25   files anywhere as to exactly how this product works.  That's

1   why we had to do all this experimental work.  That's why the

2   parties have spent all this money, and all this effort and

3   hired all these experts to do it.  So, that's -- that's what

4   this case is about.

5          It's not about what's in some email that's buried

6   somewhere.  It's not about what' in a protocol for another

7   product.

8          THE COURT:  I can Mr. Sipes, you're anxious.  And

9   let me have -- I'll allow you to have the last word since

10  you're -- it's your burden.

11         MR. SIPES:  Let me try to first address the

12  substance so, at least, we can understand what might have been

13  in these documents.  And then I just have a few quick points.

14

15

16

17

18

19                         **(REDACTED)**

20

21

22

23

24

25

1                          **(REDACTED)**

2                                              And it couldn't

3    be the case that they were uninterested in where their product

4    released.

5              They were trying to make a product that behaved like

6    Asicol.  It is true, however, that the trail of paper

7    documents goes cold at this point.

8

9

10

11                          **(REDACTED)**

12

13

14

15

16             But yes, the paper trail goes cold at that point.

17

18             Now, the law, and for example, it's set forth in the

19   Mosat case (phonetic) is not that we have to show what was in

20   the documents we never got in order to show prejudice.

21             What we know is that in developing the product,

22   Roxane cared very much about where their product released.

23   They had to.  They had to.  They had to make a product that

24   was going to be bioequivalent.  That depended on where it

25   released.

1          But we don't have those documents anymore.  Yes, we

2     have been forced to do testing, in part, to try to fill that

3     in.  But we've clearly lost a considerable amount of inquiry

4     by Roxane on this very question.

5

6

7

8                              **(REDACTED)**

9

10

11

12

13          THE COURT:  Well, as I understand, and I know I

14     said, I would let you have the last word.  But that's one

15     issue, Mr. Galbaith, that I actually hadn't seen before where

16     if I am recalling correctly that Roxane just simply included

17     Medeva's labeling information.  I think that's what you said

18     when you submitted your Enda and that you really didn't do any

19     of your own testing, or something to that effect.

20          MR. GALBAITH:  Your Honor, there's a -- there's a

21     FDA -- the way it works is that when you file an A and DA, you

22     are required as an initial matter to copy the brand of

23     labeling.  Okay?  Your first filing is the branded label with

24     the brands name cut up or crossed out.  Sometimes, it's just

25     done physically, "x"'d out and your own names stuck in there.

1    That's what goes in on the first day.

2              Now, as the A and DA progresses, if there is places

3    in which you want to deviate from the branded labeling, the

4    FDA has to authorize that.  It has to approve that.

5

6                            **(REDACTED)**

7

8              THE COURT:  Well, you put in -- what did you put in

9    your paragraph four in connection with that?  Do you repeat it

10   there, as well.

11             MR. GALBAITH:  The paragraph four certification that

12   goes to the FDA just says the patents invalid or

13   unenforceable.

14             THE COURT:  No detail.

15             MR. GALBAITH:  Not necessarily to the FDA.  But the

16   -- what -- what goes into the -- what the FDA is interested in

17   itself.  You know you have to do certain things with respect

18   to patents for the FDA, but the FDA doesn't look at the

19   patents.  That's -- that's up to the litigants to figure that

20   out.

21             But what you have to convince the FDA of is that

22   you're a and DA product is equivalent to the branded product.

23   And the first thing you do, everybody does this, even if

24   they're going to change the label, is copy the branded label.

25   And that's what Roxane did.  They copied the branded label.

1    And then they went back and modified it to -- to conform more

2    with what they thought the facts would be.

3

4

5

6

7                              **(REDACTED)**

8

9

10

11

12

13              THE COURT:  But how do you explain on page 12 and 13

14    of Medeva's opening brief, the first two items in the chart

15    that Medeva's prepared seem to be the A and DA filed with the

16    FDA.  So, that perhaps is simply Roxane cutting and pasting

17    from Medeva's.

18

19

20                              **(REDACTED)**

21

22

23              And so there are a number of other documents where

24    they're talking about the release so, you -- your company --

25    your client actually is making some assertion about that.  And

Argument - Galbaith                                54

1    what would be the basis for that?

2

3

4                              **(REDACTED)**

5

6

7

8            MR. GALBAITH:  But this was their supposition about

9    how it worked because that's how they made it and assumed it.

10           THE COURT:  Do they always give suppositions to the

11   FDA?

12           MR. GALBAITH:  I don't think they -- I don't think

13   these --

14           THE COURT:  Well, or I'm sorry, or in your paragraph

15   four notice, which is --

16           MR. GALBAITH:  They give their best -- they give

17   their best belief.  They give data to the FDA and the FDA

18   accepts it or not.

19

20

21

22                            **(REDACTED)**

23

24

25

1

2          MR. SIPES:  Just so we gave it to one more agency,

3    and as a lawyer who actually does some business for FDA, you

4    never submit something to the FDA that you don't believe.

5    There's a criminal statute.

6          THE COURT:  Well, I don't think Mr. Galbaith's

7    suggesting that they didn't believe it.  The question is why

8    did they believe it.

9          MR. SIPES:  And that's what they're suggesting is

10   they were not concerned with where it was releasing.  There's

11   a host of documents.

12

13                        **(REDACTED)**

14

15                             That's our exhibit 26, page

16   162, RLI1955.

17          They even submitted a patent application, which, of

18   course, was submitted under oath, in which their developers,

19   Mr. Schlockla (phonetic) I believe was one of them, said --

20   described Roxane's product as delivery of the target -- of the

21   tablet is targeted in the upper gastrointestinal tract, ug

22   upstream of the colon.  Again, that would be the terminal

23   colon.

24

25                        **(REDACTED)**

The Court                                56

1

2                                           And as

3    I've said, the paper trail is gone.  The documents are

4    missing.  That's why we're in this boat now.

5            THE COURT:  Okay.  Thank you.  Can I ask you to

6    indulge me just for a few minutes?  I want to confer with my

7    brain trust.  Make sure that I didn't miss anything and we'll

8    be just a few minutes.  And hopefully get you out of here

9    shortly.  We'll be just a few minutes.

10                     (End of proceeding)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

      I, Lisa M. Urban, the assigned transcriber, do hereby certify the foregoing transcript of proceedings in the U.S. District Court on November 23, 2010 on CD number 11/16/09, Index Nos. 2:37 pm to 3:46 pm is prepared in full compliance with the current Transcript Format for Judicial Proceedings and is a true and accurate non-compressed transcript of the proceedings to the best of my knowledge and ability.

  S/ Lisa M. Urban
LISA M. URBAN, AOC NO. 585
AudioEdge Transcription, LLC

Date: December 10, 2010